(78 South. 261)

No. 21180.

SANDLIN et ux. v. COYLE et al. ·

(Feb. 25, 1918. Rehearing Denied April 1, 1918.)

*(Syllabus by Editorial Staff.)*
On Motion to Dismiss Appeal.

1. COURTS &#9901;224(11)—APPELLATE JURISDICTION—AMOUNT INVOLVED.

Where plaintiff sought damages in the amount of $2,950 and his wife subsequently intervened and demanded $1,000 and adopted the allegations of her husband's petition and the demands of plaintiff and the intervener were rejected in one verdict and judgment, the amount involved was not below $2,000, the lower jurisdiction of the Supreme Court, and the appeal will not be dismissed.

O'Niell, J., dissenting.

*(Syllabus by the Court.)*
On the Merits.

2. LANDLORD AND TENANT &#9901;173—DRIVING AWAY TENANT—DAMAGES.

Damages will be awarded to the owner of a plantation for an act of violence which results in driving a tenant, planting on shares, from his plantation.

*(Additional Syllabus by Editorial Staff.)*

3. LANDLORD AND TENANT &#9901;173—DRIVING AWAY TENANT—ACTION FOR DAMAGES—ESTOPPEL.

In action by owner of plantation for damages for acts of violence, resulting in driving away a tenant planting on shares, plea of estoppel, based on owner's effort to dissuade defendants and his inviting them into his house, not showing consent to their unlawful purpose, was without merit.

4. DAMAGES &#9901;184, 192 — DRIVING AWAY TENANT—EVIDENCE.

In such action, evidence *held* not to sustain a claim for damages for vexation and humiliation, or for damages suffered by plaintiff through illness of his wife.

5. DAMAGES &#9901;184—DRIVING AWAY TENANT—EVIDENCE.

In such action, wherein the wife of the owner intervened, evidence *held* not to support her claim for $1,000 damages for shock, annoyance, sickness, and prolonged mental suffering.

Leche, J., dissenting.

Appeal from Second Judicial District Court, Parish of Webster; John N. Sandlin, Judge.

Action by S. B. Sandlin and Mrs. Annie Sandlin against R. M. Coyle and others. Judgment for defendants, and plaintiffs appeal. Motion to dismiss appeal denied, and judgment reversed in part and affirmed in part, and judgment rendered in favor of plaintiff S. B. Sandlin and against defendants in solido, and judgment against Mrs. Sandlin affirmed.

Roberts, Roberts & Johnson, of Minden, for appellants. W. R. Percy, of Shreveport, for appellees.

On Motion to Dismiss Appeal.

SOMMERVILLE, J. [1] Since the case was submitted, defendants have moved to dismiss the appeal herein on the ground that the amount claimed by plaintiff Sandlin is below the lower jurisdiction of the court.

The amount originally claimed by plaintiff was $3,900 for injuries to him personally, and to him through injury to his wife.

On exception, the $1,000 claimed by him for damages to him on account of injuries to Mrs. Sandlin was dismissed. The ruling was erroneous.

Mrs. Sandlin subsequently intervened in

the suit, and demanded $1,000 from defendants; and she adopted the allegations made by her husband in his petition on account of damages to her. The demands of plaintiff and intervener were rejected in one verdict and judgment.

Mr. and Mrs. Sandlin both appealed.

In oral argument, in this court, counsel for plaintiff, Mr. Sandlin, abandoned the claim for $950 for statutory damages. This abandonment reduced Sandlin's claim as originally made from $3,900 to $2,950.

Defendants argue that Sandlin's claim was further diminished by the $1,000 which he originally claimed for injury by the defendants to Mrs. Sandlin, which resulted in further damage to him, and which claim was dismissed on exception. The judgment on the exception was embraced in the appeal taken by Sandlin from the final judgment in the case; and his claim for $2,950 is before the court for adjudication.

In La Groue v. New Orleans, 114 La. 253, 38 South. 160, where Mrs. La Groue sued defendant for $2,100 for personal injuries, and her husband joined in the same petition and asked for $225 for damages to him arising from the injuries sustained by his wife, and there was judgment for plaintiffs, and Mr. La Groue moved to dismiss the appeal as to him, the motion to dismiss was denied. The court say:

"The demand of Melville La Groue is for $225, founded, however, on the same cause of action as the demand of his wife for $2,100, which, under Act 68, p. 95, of 1902 is her separate, individual property. In Bowman et al. v. City of New Orleans, 27 La. Ann. 501, the court held that where several plaintiffs united in one suit, for convenience and economy, against the city of New Orleans, for damages arising from one and the same cause, the total amount prayed for in the petition was the test of the jurisdiction of the Supreme Court. See, also, Armstrong v. Railroad Co., 46 La. Ann. 1448, 16 South. 468. In Clairain v. Telegraph Co., 40 La. Ann. 178, 3 South. 625, this court held that the claims of the widow and of the minor children for damages resulting from the death of the deceased were properly presented in a single suit, because arising from the same cause, citing Riggs v. Bell, 39 La. Ann. 1031, 3 South. 183, holding that, although defendants may have distinct defenses, they may be brought in together to defend the suit, 'where the causes have a cognate origin, and they have a common interest to be adjudicated upon.' In the latter case the court said:

" 'The law abhors a multiplicity of actions and favors the institution of suits against all defendants who may be liable for the same original cause, and who may have an interest to resist a plaintiff.' 'Interest reipublicæ ut sit finis litium.' "

"For the same reasons, the joinder of plaintiffs is allowable under similar circumstances, and, where they join, the defendant should not be required to take a multiplicity of appeals. We consider that, as to the defendants herein, the amount in dispute is the total amount sued for."

The motion to dismiss is denied.

### On the Merits.

[2] Plaintiff, a farmer engaged in planting on the share system, alleges that he had entered into a written contract with Frank Gilford, a colored tenant, to plant about 48 acres in cotton and corn during the year 1913; that defendants, eight in number, led by R. M. Coyle, of Cotton Valley, came upon his place for the purpose of taking Frank Gilford into custody, and to chastise and punish him for failing to pay R. M. Coyle $50 which he owed him; that such unlawful and violent acts and threats by defendants caused Frank Gilford to abandon his contract and to flee for safety, taking his family with him, thus causing a loss to petitioner of $950 actual damages; $950 statutory damages, and $1,000 for vexation, humiliation, and mortification, and $1,000 for heavy expenses, worry, and uneasiness because of the prolonged spell of illness of his wife, caused by the said illegal acts of defendants.

Defendants excepted that under Act 54, 1906, p. 87, damages for interference with labor was limited to double the amount of debt due by the laborer, that plaintiff did not allege any debt to be due him by his tenant, and that the petition disclosed no cause of action.

This suit is an ordinary one for damages, and does not appear to have been brought under the statute referred to by defendants. The remedy given in the statute is not exclusive in its terms. It admits of another cause of action for damages under article 2316, C. C. Plaintiff's cause of action is not within the terms of the statute; the exception was properly overruled.

Mrs. Sandlin, wife of plaintiff, intervened and claimed $1,000 damages for shock, annoyance, and worry resulting in a long spell of illness and mental and physical suffering, caused by the unlawful acts of defendants.

Defendants answered, denying the principal allegations of plaintiff's petition, and alleged that Frank Gilford had written R. M. Coyle an insolent letter, practically demanding an apology for some fancied injury, and hinting violence if it was not forthcoming. They admit that they went upon plaintiff's plantation on the day mentioned, and disclosed to him their desire to see Frank Gilford, and asked permission to see him; that they first sent a small delegation to plaintiff so as not to injure him or scare Frank Gilford. They allege that plaintiff consented to their request to see and speak to Frank Gilford, and they pleaded an estoppel, based on the alleged consent, to plaintiff's claim for damages.

There was trial by jury, and verdict and judgment for defendants. Plaintiffs have appealed.

Defendant Coyle testified:

"I went there (to plaintiff's plantation) to whip Frank Gilford, and to talk to Bartow Sandlin (plaintiff) about doing it, because he had written me an insulting letter." "To begin with Frank owed me a debt of $50, or fifty some odd dollars, and I seen Frank in town up there at the Cotton Valley Drug Store, and I sent for him to come down, I wanted to see him." "We got up the crowd, and me and five men stopped before we got to Mr. Sandlin's place, and we sent these two other men over there to see Mr. Sandlin." "T. S. Young and Ernest Crawford." "The reason we sent them was because they were men that we didn't think the negro would suspicion, as neither were in the crowd before, and they could talk with Mr. Sandlin and find out where the negro was, and we could make our arrangements to get a hold of the negro. * * * Shortly after they went over there, Mr. Crawford came back. * * * I went over to where Mr. Sandlin was, rode up, got down, talked to Mr. Sandlin, told him what my business was, and told him what we wanted to do. I said—I asked him where the negro was, and he said he had stepped off. 'Well,' I says, 'You have him to come back, and let us give him a thrashing, and put him back to work, and if he runs off, and you need any assistance in putting him back, let us know and we will put him back.' He said: 'No; I couldn't do it in the presence of my other hands; that would be against me in getting labor.' He said that he would rather they would not know that he knew anything about it. He then proposed for the crowd to come on in the house, and then ride off like we were going home; after dinner he would send this negro back there to work, and that he himself would ride over to his store. * * * About a mile. So we rode off, and came back around the field next to McGee's on the railroad there, and laid down and waited until he ate dinner. He said he would have him back at 1 o'clock, and at 1 o'clock we rode back to his place, and hitched our horses to go back to where the hands were working. The two hands were there, but he wasn't there—we seen that the negro wasn't there; and we started up the road to where our horses were. Mr. Sandlin was in his yard, in sight of us, and as we were going up by the side of the fence, he hollowed at us, and we stopped. He came up, and he said: 'Boys, he got on to it that you-all had not gone, and I could not get him to come up here;' and I said: 'Well, we can get him some time;' and we stood and talked a little while, and I said: 'It would save us a whole lot of trouble if you would just let us have him this evening, as we are going to get him anyhow some time.' I believe I told him that we would not go into a white man's yard to get a negro, so we got on our horses, and went on home. The next time I saw Mr. Sandlin he was as friendly as ever, and I didn't know his feelings were hurt. While we were talking that morning, he said to me: 'He has only been here a few days, and rather than have you whip him before these negroes and me, I would rather let him go, because I can let him go without damage now.'"

Question by counsel for defendant: "Mr. Coyle, what statement, if any, did Mr. Sandlin make to your mob, or committee, or whatever it was, that went down there, about taking dinner with him, etc.?"

Answer: "When we left—went to leave—he says: 'If you-all have got a cook in the crowd, let's go put the horses up and feed them and go and have dinner. My wife is at school. That leaves no cook for me, and I am no cook. You are all welcome. We have plenty to cook, if you all will cook it.'"

Question: "That was on the second trip?"

Answer: "First trip. We thanked him, but

said we would go home, bid him good-bye, and rode off and left him, and were feeling good over the shape we had the thing in to get the negro. We were figuring on him sending the negro out to work and him going back to the store."

Question: "What would have happened to Frank if Mr. Sandlin had not been out there with him that morning?"

Answer: "Well, they would have got hold of him, and they would have whipped him real good, give him a good whipping."

The tenant, Frank Gilford, testified on the trial that he saw defendants on their visit to Mr. Sandlin's place, and knew that they were demanding that he be delivered to them; that he left to save his life, and went to Arkansas to live. He testified that he heard Mr. Crawford ask Mr. Sandlin if he (Frank Gilford) was there, and that he then left. Crawf Dillon, another tenant on plaintiff's place, who was with plaintiff and Frank Gilford, when Mr. Crawford and Mr. Young, two of the defendants, rode up, testified; and he supports Frank Gilford's testimony to the effect that he heard Mr. Crawford say that they had come after Frank Gilford.

It was repeatedly admitted by the defendants on the stand that they had gone to plaintiff's place to whip one of his tenants for a grievance that R. M. Coyle had against that tenant, with the effect of driving the tenant off of the plantation and out of the state thus causing plaintiff loss and damage.

The method adopted by defendants to settle an individual dispute between Mr. Coyle and Frank Gilford was a violent and unlawful act on their part.

In this state laws have been passed and courts have been established that individual disputes might be settled without resorting to violence. And when defendants violated the law, invaded plaintiff's property, unlawfully sought to injure plaintiff's tenant, drove him off the place, and damaged plaintiff, they must repair that damage. Cooper v. Cappel, 29 La. Ann. 213; Dirmeyer v. O'Hern, 39 La. Ann. 961, 3 South. 132; Kernan v. Humble, 51 La. Ann. 389, 25 South. 431.

Plaintiff tried in vain to get another tenant to take Frank Gilford's place, but failed. He lost his one-half of the crop which Frank Gilford would have made during the year 1913.

That year was favorable to cotton planting, and it was reasonable to have expected Frank Gilford and his two helpers to have grown and gathered as much cotton and corn as others did in the immediate neighborhood.

Plaintiff testified that he leased to Frank Gilford 32 acres to be planted in cotton and 8 acres to be planted in corn; that the yield was in the neighborhood of 967 pounds of seed cotton, and 40 bushels of corn per acre; that lint cotton averaged between 11 and 12 cents per pound. He did not testify to the value of corn. The one-half of the cotton, which would have been plaintiff's share, was 5,157 pounds; at 11½ cents per pound, it would have brought $593.05. He is entitled to judgment therefor.

[3] The plea of estoppel should have been overruled. Defendants invaded plaintiff's plantation without his knowledge or consent, and for an unlawful purpose. After they were there plaintiff sought to dissuade them from their purpose, and invited them into his house. He may have told them to go for a short distance, so as to give Frank Gilford an opportunity to save himself from assault. But the evidence does not show that the plaintiff consented that defendants might come upon his plantation for an unlawful purpose.

[4] Plaintiff further asks for $1,000 damages from defendants for vexation, humiliation, and mortification caused by the unlawful acts of defendants. He testified in a vague way that he had suffered damages to that extent; but he did not testify definitely as to them, or to the amount.

In the absence of certain testimony that

plaintiff suffered vexation, humiliation, and mortification because of the acts of defendants, and considering the testimony that plaintiff invited defendants to dine with him while they were trespassing upon his plantation, we cannot view the claim based on humiliation and mortification as having been seriously made. The claim has not been sufficiently proved.

The same is true of plaintiff's claim for damages suffered by him through the illness of his wife. The testimony does not show that the conduct of defendants caused Mrs. Sandlin's illness, or that plaintiff was put to any expense on account thereof.

[5] Mrs. Sandlin, intervener, appeared and testified to her claim for $1,000 damages because of alleged shock, annoyance, anxiety, worry, suffering from a long spell of sickness, and prolonged mental suffering. She testified that at the time defendants visited her husband's plantation she was away from home, teaching school, and that she was told of the circumstance on her return home that evening, February 25, 1913, and that she continued to teach school until about May 1st (the school closed May 10). She did not consult a physician until July, and she did not then tell him about defendants' visit, or any shock to her resulting therefrom. We gather from Mrs. Sandlin's testimony that she worried over the financial condition of her husband, the loss of Frank Gilford as a tenant, and the failure to get another tenant, and that she was not shocked by the acts of defendants. She could not have been shocked by the visit of defendants, when she was a mile away from home at the time of the visit. She has failed to prove her case.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be reversed in part and affirmed in part; that there now be judgment in favor of plaintiff Sam Bartow Sandlin and against defendants in solido for $593.05, with costs in both

courts; and that the judgment against Mrs. Sandlin be affirmed, with costs.

LECHE, J., dissents.

See dissenting opinion of O'NIELL, J., on motion to dismiss appeal, 78 South. 264.